THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY v. MILLER, ADMINISTRATOR.

[No. 17,577. Filed February 17, 1898.]

SPECIAL VERDICT.—*Failure to Find Fact in Favor of Party Having Burden of Proof.*—A failure to find a fact in favor of the party upon whom the burden of establishing it rests, is equivalent to an express finding against him as to that fact. *p. 498.*

NEGLIGENCE.—*Willfulness.—Contributory Negligence.*—In an action against a railroad company, based on a willful killing of plaintiff's intestate, it is not necessary to show by the averments of the complaint, nor by the evidence on the trial, nor the facts in the special verdict, a freedom from contributory negligence on the part of the deceased person at the time the injury was sustained. *pp. 498, 499.*

SAME.—*Willfulness.*—To constitute a willful injury, the act which produced it must have been intentional, or done under such circumstances that the effects which followed must reasonably have been anticipated as the natural and probable consequences thereof. *p. 499.*

RAILROADS.—*Injury at Crossing. — Willfulness.*—A railroad train going at the rate of thirty-five miles an hour approached the crossing of a public highway in the country, and when at a distance of about 1,200 feet therefrom a covered buggy in which a traveler was riding was discovered by the fireman, 150 feet from the crossing,

moving towards it at a slow gait. The side curtains on the buggy prevented the traveler from seeing the train, and a strong wind was blowing in the direction thereof. The train continued its speed, and no danger signal or warning was given until the locomotive was within ninety feet of the crossing, when the fireman called to the engineer who applied the brakes and shut off the steam, but too late to prevent the killing of the traveler who had continued to approach the crossing, and was but four or five feet therefrom when the brakes were applied. *Held*, in an action against the railroad company, that the acts of the employes in charge of the locomotive were not such as would make the company liable for a willful killing. *pp. 491-510*.

RAILROADS.—*Presumption That Person Approaching Crossing Will Look and Listen*.—The employes in charge of a railroad train have a right to presume that a traveler on a public highway, who is approaching a crossing of the railroad, will not only listen, but that he will look in each direction for approaching trains. *p. 504*.

SAME.—*Special Verdict.—Incredible Finding*.—In an action against a railroad company for damages for injury willfully inflicted on plaintiff's intestate, a conclusion on the part of the jury that the fireman on the locomotive, when approaching a highway crossing, toward which a traveler was leisurely driving, actually knew what was in the mind of such traveler, and what he would do under the circumstances, cannot be accepted as credible. *pp. 507, 508*.

NEGLIGENCE.—*Willfulness.—Special Verdict*.—An action for a willful injury is not supported by a finding that the injury was the result of gross negligence. *pp. 508-510*.

From the Tippecanoe Circuit Court. *Reversed.*

*C. B. Stuart, W. V. Stuart, E. P. Hammond, G. P. Haywood, J. T. Dye, B. K. Elliott* and *W. F. Elliott*, for appellant.

*J. F. McHugh, A. L. Kumler* and *T. F. Gaylord*, for appellee.

JORDAN, J.—Appellee's intestate, Dr. Joseph H. Baker, of the age of thirty-nine years, on the 16th day of December, 1893, was killed as he was in the act of passing over appellant's railroad track at the crossing of a public highway in the country, in Tippecanoe county, Indiana, by reason of one of appellant's engines, to which a caboose was attached, colliding at

said crossing with the buggy in which Baker was riding. The complaint originally was in three paragraphs; the first proceeded upon the theory that the injury which caused the death of the deceased was willfully and purposely inflicted by appellant's servants in charge of said engine, it being alleged that said servants "willfully and purposely, and without any regard to the life or rights of said decedent, caused the said locomotive engine to run and strike upon and against said buggy in which the said Joseph H. Baker was then and there riding," etc. The second and third paragraphs were based upon the alleged negligent killing of Baker by appellant. A demurrer to each paragraph was overruled, and appellant answered by a general denial. After the introduction of the evidence, appellee dismissed the second and third paragraphs of his complaint, and the cause was submitted to the jury upon the cause of action set up in the first paragraph. The jury returned a special verdict, upon which both the appellant and appellee moved for judgment. The court denied the motion of the former and sustained that of the latter, and rendered judgment in his favor for five thousand dollars, being the amount of damages assessed by the jury in the special verdict.

The errors assigned in this court, are, in part, based upon the court's overruling the demurrer to the first paragraph of the complaint, and upon its sustaining the motion of the appellee for judgment on the verdict, and in denying that of appellant, and in overruling its motion for a new trial.

Assuming, without deciding, that the first paragraph of the complaint sufficiently charges a willful or intentional killing of the deceased by the servants of appellant, we pass to the consideration of the sufficiency of the facts embraced in the special verdict

to sustain the judgment under the issue raised by the first paragraph of the complaint.

The verdict, after stating facts to show that the plaintiff is the administrator of the estate of Joseph H. Baker, deceased, etc., and that the defendant is a corporation operating a railroad from the city of Indianapolis, Indiana, through the township of Wea, in Tippecanoe county, in said State, proceeds as follows: "that in said Wea township the railroad track of said defendant is crossed by a public highway, which is frequently traveled, known as the 'Stubtail Gravel;' that said highway runs in a northerly and southerly direction, and crosses said railroad track on the same grade; that said railroad track at said point runs in a northwesterly and southeasterly direction, and approaches and crosses said highway from the southeast at an angle of forty degrees; that from a point on said railroad track 2,265½ feet southeast of said highway crossing said railroad track is, for a distance of 1,391 feet towards said highway crossing on a descending grade of 25 1-3 feet per mile, and from there to said highway crossing is on an ascending grade of six feet per mile; that at a point 2,265½ feet southeast of said highway crossing, and extending thence in a southeasterly direction along the west side of said railroad track for a distance of 2,300 feet, there is a hedge fence 20 to 25 feet high; that at a point 482 feet southeast of said highway crossing, and from thence for a distance of 525½ feet, said railroad track is in a cut which is in some places six feet deep, but of an average depth of 3½ feet; that on the east side of said highway, and south of said railroad track, there is a barn and frame house; that the north line of said barn is 452 feet south of the place where said highway and railroad cross; that the north line of said frame house is 337 feet south of said crossing;

that said barn and house are, respectively, 18 and 48½
feet long from north to south; that the distance be-
tween said house and barn is about 67 feet; that said
barn and house are respectively, 19½ and 17¾ feet high,
and are, respectively, 78 and 65 feet from said high-
way; that said railroad crossing and said surround-
ings are practically the same now as they were on the
16th day of December, 1893; that on the 16th day of
December, 1893, Joseph H. Baker, the decedent, was
riding along said highway in a buggy which made con-
siderable noise, drawn by a horse driven by him, and
as he approached said railroad crossing, and had
reached a point on said highway between said barn
and house, he leaned forward, listened, and looked east-
ward for the approach of a train towards said cross-
ing from the southeast, and did not see nor hear any
train approaching said crossing from the southeast;
that the buggy in which the decedent was then riding
was an ordinary top buggy, and had its side curtains
on, and said decedent could not see in an easterly di-
rection without leaning forward; that the horse draw-
ing said buggy was gentle, and would not frighten at
the approach of a railroad train; that said decedent
did not look for nor learn of the approach of a train
on said railroad track from the southeast until he had
reached and entered upon said railroad track of the
defendant; that as said decedent approached said rail-
road crossing in said buggy as aforesaid, the horse
drawing the same proceeded in a slow trot until it
had reached a point on said highway 150 feet south of
said railroad crossing; that from said point on said
highway 150 feet south of said crossing said horse
drawing said buggy proceeded in a slow walk until it
had entered upon the track of said defendant at said
highway crossing; that as said decedent approached
said crossing as aforesaid his view of a train approach-

ing said crossing from the southeast was obstructed by said hedge fence, said barn, and said house, and that said hedge fence, barn, and house were the only obstructions to decedent's view of an approaching train on said track from the southeast for a distance of more than one-half mile south of said crossing; that on the 16th day of December, 1893, at 12:50 o'clock p. m., a locomotive engine, with a caboose attached, left North Indianapolis, Indiana, in charge of the servants of the defendant, and proceeded towards said city of Lafayette; that said train was a non-scheduled or 'wild train,' and was not limited as to speed; that at or near Culvers, and about three miles southeast of said crossing, said train approached and passed three highway crossings running at the rate of sixty miles an hour, without the whistle or bell attached to said engine being sounded or rung; that said engine and caboose approached and passed a highway crossing about three-fourths of a mile southeast of the place where said railroad track crosses said highway known as the 'Stubtail Gravel' at a speed of fifty miles an hour without the whistle or bell attached to said engine being sounded or rung; that said engine and caboose approached and passed a highway crossing about 2,240 feet southeast of the place where said railroad track crosses said highway known as the 'Stubtail Gravel' without the whistle or bell attached to said engine being sounded or rung; *that the act of said defendant's servants in not sounding said whistle or ringing said bell, when approaching said crossings as aforesaid was done with a reckless disregard for the safety of persons traveling along said highways and a willingness to inflict injury* [our italics]; that on the 16th day of December, 1893, at about 3:50 o'clock p. m., of said day, said locomotive engine, with said caboose attached, ap-

proached from the southeast the place where said railroad track was crossed by said highway known as the 'Stubtail Gravel' at a high rate of speed, to wit, at least thirty-five miles per hour, and when said engine reached said crossing it struck, with great force and violence, the buggy in which said decedent was then and there as aforesaid, and said decedent was thereby thrown from said buggy on the ground, and was thereby so severely injured that he afterwards, on said day, died from his said injuries so received as aforesaid; that the servants of the defendant who were then and there in charge of said locomotive engine did not, as they approached said crossing, sound the whistle or ring the bell attached to said engine, nor give any signal whatever of the approach of said engine to said crossing; that when said engine was ninety feet from said crossing the engineer put on the air brakes with which said engine was equipped, shut off the steam, and reversed said engine; that the speed of said engine was thereby slackened, and said engine came to a stop one-quarter of a mile northwest of said crossing; that on the afternoon of said 16th day of December, 1893, the wind was blowing strongly from the west, and that when said engine was approaching said crossing as aforesaid the wind was blowing strongly from the west, and against said engine, and prevented a person traveling on said highway near said crossing in a buggy with the top up and side curtains on from hearing the approach of said engine to said crossing; that when said engine was between 1,200 and 1,300 feet from said crossing the fireman, who was on the left or south side of said engine, saw the horse and buggy in which the decedent then and there was on said highway approaching said railroad crossing; that when said fireman first saw said horse and buggy they were one hundred and fifty feet from said cross-

ing; that from the time said fireman first saw said horse and buggy as aforesaid he continuously observed the same until said buggy was struck by said engine as aforesaid; that when said fireman first saw said horse and buggy approaching said crossing said horse was moving in a slow walk, and continued so to move until said railroad crossing was reached as aforesaid; that when said engine was ninety feet from said crossing said fireman said 'Whoap! Whoap! Whoap!' to the engineer, and said engineer thereupon applied said air brakes, shut off the steam and reversed his engine as aforesaid, and at said time said decedent was within four or five feet of the south rail of said track; that said fireman knew as said engine approached said crossing that a person on said highway near said crossing could not, by reason of the velocity and direction of the wind, hear the noise of an approaching train; that said fireman knew, while said decedent was approaching said crossing, and was more than 100 feet south of said railroad that the decedent did not see or know that a train was approaching said crossing; that said fireman knew, when he saw said decedent approaching said crossing as aforesaid, that unless the whistle or bell on said engine was sounded or rung, or some warning given, said decedent would proceed toward and upon said crossing, and would be struck by said engine; that said fireman did not give, nor did he cause to be given, any signal by bell or whistle or otherwise, to said decedent of the approach of said train to said crossing; *that the act of said fireman in not giving or causing to be given any signal by bell or whistle or otherwise to said decedent as he approached said crossing, caused the death of said decedent as aforesaid, and was done by said servant with a reckless disregard for the*

*safety of said decedent and a willingness to inflict an injury upon him.*" (Our italics.) The remainder of the verdict states facts appertaining to the question of damages, and the amount assessed by the jury, in the event that the law on the facts found be in favor of the plaintiff.

The burden on the issue joined between the parties to this action was cast upon the plaintiff below, appellee here. It has been affirmed and reaffirmed by the decisions of this court that the office of the special verdict is to find facts, and that no omission of a fact therein can be supplied by intendment. A failure to find a fact in favor of the party upon whom the burden of establishing it rests is equivalent to an express finding against him as to that fact. It is also a well settled rule of procedure that when a party who has the *onus* under the issues in the case demands a judgment in his favor on the facts stated in a special verdict, he is required to show by the material facts therein, which are within the issues, that he is entitled to a judgment; otherwise, he will fail in his demand. But where the moving party is not the one upon whom rests the burden of the issue, he may obtain a judgment in his favor with less difficulty, as it is a well recognized principle that the right of a party not having the burden to be awarded a judgment depends not alone upon the presence therein of material facts, but he may be entitled to it solely for the reason that there is an absence of some essential fact or facts which it was incumbent on his adversary to establish. *Rice* v. *City of Evansville*, 108 Ind. 7; *Trittipo* v. *Morgan*, 99 Ind. 269; Elliott's App. Proc., sections 753 and 754.

The appellee in this case, in order to prevail, if at all, must do so upon the cause of action alleged and set up in the first paragraph. The theory of the complaint, as constituted by this paragraph, as here-

tofore said, is that the appellant, by its servants in charge of the engine on the occasion and at the place in question, willfully or intentionally inflicted the injury which resulted in the death of appellee's decedent. The complaint being based on a willful killing of the deceased, it was not necessary to show by its averments, nor by the evidence on the trial, nor the facts in the special verdict, a freedom from contributory negligence on the part of the deceased person at the time the alleged injury was sustained. *Fisher* v. *Louisville, etc., R. W. Co.,* 146 Ind. 558.

The controlling question in the case does not depend on the negligence of either the appellant or appellee's intestate, and a recovery in favor of the appellee can only be sustained upon the ground that the injury which caused the death was willfully or intentionally inflicted, or that the act or conduct of the appellant from which in this case the fatal injury resulted was willful on its part, and of such a character, in the latter event, that the effects which followed must reasonably have been anticipated as the natural and probable consequences of said act or conduct. *Louisville, etc., R. W. Co.* v. *Bryan,* 107 Ind. 51; *Belt R. R., etc., Co.* v. *Mann,* 107 Ind. 89; *Louisville, etc., R. W. Co.* v. *Ader,* 110 Ind. 376; *Fisher* v. *Louisville, etc., R. W. Co., supra; Conner* v. *Citizens' Street R. R. Co.,* 146 Ind. 430.

Mitchell, J., speaking as the organ of this court, in the Bryan case above cited, in reference to the rule applicable to a willful or intentional injury, said: "Where one person negligently comes into a situation of peril, before another can be held liable for an injury to him, it must appear that the *latter had knowlledge of his situation in time to have prevented the injury.* Or it must appear that the injurious act or omission was by *design,* and was such—considering

the place—as that its nature and probable consequence would be to produce serious hurt to some one. To constitute a willful injury, the act which produced it must have been intentional, or must have been done under such circumstances as evinced a reckless disregard for the safety of others, and a willingness to inflict the injury complained of. It involves conduct which is *quasi criminal.*" (Our italics.)

In *Conner* v. *Citizens Street R. R. Co.*, *supra*, this court, after referring to cases in which contributory negligence on the part of the injured person was not a bar to a recovery, said: "The substance of the rule as established by the cases to which we have referred is, that to entitle one to recover for an injury without showing his own freedom from contributory fault, the injurious act or omission must have been purposely and intentionally committed, with a design to produce injury, or it must have been committed under such circumstances as that its natural and reasonable consequence would be to produce injury to others, the actor having knowledge of the situation of those others."

Our decisions recognize the doctrine, that where the act of the wrongdoer is so recklessly done, in disregard of the probably consequences, a willingness or intention to inflict the injury which results therefrom may be implied, and the distinction between an actual intention to do the injury, and a constructive one is shown. See *Pennsylvania Co.* v. *Sinclair*, 62 Ind. 301; *Palmer* v. *Chicago, etc., R. R. Co.*, 112 Ind. 250, and cases there cited; *Cincinnati, etc., R. R. Co.* v. *Cooper*, 120 Ind. 469.

In the appeal of *Parker* v. *Pennsylvania Co.*, 134 Ind. 673, the difference between willfulness and negligence as defined by the law is pointed out. It is there said: "Willfulness does not consist in negligence. On the contrary, as illustrated by the cases of Bryan and

Mann, heretofore cited, *the two terms are incompatible.* Negligence arises from inattention, thoughtlessness, or heedlessness, while willfulness *cannot exist without purpose or design.　No purpose or design can be said to exist where the injurious act results from negligence, and negligence cannot be of such a degree as to become willfulness."*　(Our italics.)

Tested by the doctrine affirmed by the authorities to which we have referred (and others hereafter cited), which has been so uniformly asserted and adhered to by this court in its later decisions, the inquiry is:　Do the facts embraced in the special verdict,—rejecting, as we must, conclusions and surmises of the jury, and facts of an evidentiary character,—when considered as an entirety, with all irresistible inferences that may result therefrom, entitle the appellee to a recovery for the willful or intentional wrong perpetrated by the appellant, as alleged in the complaint?　We are of the opinion that the facts as found by the jury do not warrant a judgment in favor of the appellee on the issue tendered by his complaint.　It may be conceded that the failure or omission of appellant's employes in charge of the engine upon the occasion in question to give the signals required by law when the engine was approaching the crossing of the public highway where the collision occurred was negligence *per se;* but, as heretofore mentioned, the question of negligence is not one with which we have to deal, and under the issues we cannot affirm a judgment based on the negligence of the defendant, although the same could be said to have been gross.　The doctrine of comparative negligence does not obtain recognition in this State, and, where the negligence of the injured party contributes to the proximate cause of the injury, a comparison will not be made between the negligence of the person injured, and that of the party charged

with the wrong, in order to determine which was the greater, and award a recovery to the one guilty of the least. Negligence in a case, whether it be in a degree that may be termed slight, ordinary, or gross, is nevertheless negligence still; and when willfulness is the essential element in the act or conduct of the party charged with the wrong, the case ceases to be one of negligence. Willfulness and negligence are the opposites of each other; the former signifying the presence of intention, and the latter its absence. *Terre Haute, etc., R. R. Co.* v. *Graham*, 95 Ind. 286; 4 Am. and Eng. Ency. of Law, pp. 80 and 81, and authorities there cited.

The liability of appellant, under the circumstances in this case, must be tested or measured by the acts or conduct of its employes in control of the engine after they became aware that the deceased was approaching the crossing where the collision occurred. *Terre Haute, etc., R. R. Co.* v. *Graham, supra.* But we may again affirm that the liability of the company, under the issues in the action, cannot be fixed or controlled by the negligence of its servants on the occasion in question. An examination of the facts stated in the verdict discloses that when the train was approaching the Stubtail Gravel crossing, at which the collision occurred, it was running at a speed of thirty-five miles per hour, and when at a point 1,200 or 1,300 feet from the crossing, the fireman, who was on the left or south side of the engine, first saw the buggy in which the deceased was riding on the highway; that at that time it was one hundred and fifty feet from the crossing, and the horse drawing the buggy was moving in a slow walk towards the crossing, which gait was continued until the latter was reached. It also appears that from the time the fireman first saw the horse and buggy he continuously observed the same until

the vehicle was struck by the engine. When the en-
gine was ninety feet from the crossing, approaching
the same, the fireman said or exclaimed to the engineer,
"Whoap! Whoap! Whoap!" and the latter thereupon
applied the air brakes, shut off the steam, and re-
versed the engine, and slacked its speed; and when
this was done, the deceased was till on the highway,
some four or five feet from the crossing. While it is
true these efforts and acts of the engineer and fire-
man, when they discovered the danger to which the
deceased had subjected himself in his attempt to go on
to the track, did not prevent the fatal collision, never-
theless they show that when what may be said to have
been the actual peril of the deceased, under the cir-
cumstances, was fully apparent, these servants invoked
and used all the means at their command to avoid the
injury. It must be remembered that when the fireman
first saw the deceased he was on the highway, in his
buggy, one hundred and fifty feet from the crossing,
moving at a slow gait. He was not on the track, nor
in any way at that time subjected to danger. The
speed of the train had been reduced to thirty-five miles
per hour when it approached this particular crossing.
Certainly it cannot be asserted that this speed, under
the circumstances, when approaching the crossing of
a rural highway, outside of the limits of a town or
city, as it was, was even an act of negligence, much
less that it indicated on the part of those in control
of the engine a willingness, either express or implied,
to inflict an injury upon anyone. The crossing, in the
main, seems to have been that of an ordinary highway.
The conduct of the deceased, when first seen on the
highway driving towards the crossing, was apparently
that of an ordinary person. There is nothing to show
that he was not endowed with and possessed at the
time all the senses and faculties ordinarily possessed

by a human being. Appellant's servants had the right, under the circumstances, to presume that the deceased, before reaching the crossing, would exercise proper caution to prevent injury to himself; that he would not only listen, but also look in each direction for approaching trains, before attempting to cross the track, and, if he did so, he would see the train and be warned, and stop at the last moment, before entering on the track. If they acted on the presumption that the deceased would look out for his own safety, until it became too late, by the use of the means within their control, to avoid the collision, this would not establish that the injury was willfully inflicted. *Indianapolis, etc., R. R. Co.* v. *McClaren*, 62 Ind. 566; *Terre Haute, etc., R. R. Co.* v. *Graham*, *supra; Palmer* v. *Chicago, etc., R. R. Co.*, *supra; Pennsylvania Co.* v. *Meyers*, 136 Ind. 242.

It was apparently but a moment before the collision that the deceased entered upon the track. It is true that he was seen approaching the crossing at a slow gait, but as we view the legitimate facts in the case, there is nothing that could have indicated to the fireman, to whom the willfulness to injure him is imputed, that he would not at least look, even if he could not hear the train by reason of the wind, and thereby be warned of the impending danger. There are no facts or inferences that may be deduced therefrom to show that the fireman or engineer, after becoming aware that the deceased was not going to stop before entering on the track, failed or omitted to exercise the proper degree of care by employing the means at hand to prevent the collision. The instant it appeared that he was not going to stop, all seems to have been done that could be, to prevent the engine from colliding with the buggy. In reason it cannot be claimed, under the circumstances, that appellee's decedent

could not have seen the train, had he looked in the direction from which it was approaching, in time to have stopped his horse before going upon the track. He was driving at a slow walk along a country road, and nothing is shown to rebut the contention of the appellant that he could have stopped his horse in a moment, without difficulty, and in a place of safety. For anything that appears, he might have done so at the last moment, when within five feet of the crossing with the engine ninety feet beyond. The fireman, under the circumstances, was not bound to presume that he did not see the train, but he had the right to rely on the assumption that he would look and see it, and that thereby he would be actuated by the natural prompting of self-preservation common to mankind in general, and stop before attempting to cross, and not subject himself to peril.

Where a person traveling on a highway, in his approach to a point where it crosses a railroad, can, by looking or listening, see or hear an approaching train in time to avoid injury, in the event he is injured, under such circumstances, by a collision, the law assumes that he neither looked nor listened, or, if he did either, that he did not heed what he saw or heard. *Smith* v. *Wabash R. R. Co.*, 141 Ind. 92, and authorities there cited.

While the rights of a traveler on a public highway to pass over a railroad crossing of such highway may be said, ordinarily, to be equal to that of the railroad company, nevertheless he is required to exercise due caution or care under the circumstances. He is bound to know that there may be peril in attempting to cross. The railroad track is itself an admonition of danger. He is bound to know that he must yield precedence to the trains of the company, and has no right even to expect that their speed will be slackened, much less to

assume that they will stop to permit him to pass. He is to assume that there is danger, and act upon such assumption with ordinary prudence and circumspection. *Ohio, etc., R. W. Co.* v. *Walker*, 113 Ind. 196; Beach on Contributory Negligence, 191 and 198.

A standard author states the rule applicable to railroad crossings over rural highways as follows: "While unusual speed of railway trains does not of itself constitute negligence, yet it may be considered with other circumstances in determining the degree of care exercised. The law does not require the speed of trains to be slackened on approaching the crossing of a public highway in the country when a team is seen approaching it." 2 Wood's Railway Law, pp. 1330 and 1331.

It is true that the traveler has the right to presume that the company will discharge its statutory duty, and give the signals as required by the law; still this does not relieve him from using his own senses and exercising due care to avoid injury in crossing.

In the appeal of *Lake Shore, etc., R. R. Co.* v. *Miller*, 25 Mich. 274, the court said: "But if an engineer see a team and carriage, or a man in the act of crossing the track, far enough ahead of him to have ample time, in the ordinary course of such movements, to get entirely out of the way before the approach of the engine; or if he sees a man walking along the track at a considerable distance ahead, and is not aware that he is *deaf* or *insane*, or from some other cause insensible of the danger; or if he sees a team or man approaching a crossing too near the train to get over in time, he has a right to rely upon the laws of nature and the ordinary course of things, and to presume that the man driving the team or walking upon the track, has the use of his senses, and will act upon the principles of common sense and the motive of self-preservation

common to mankind in general; and that they will, therefore, get out of the way."

In the opinion in the case of *Maryland, etc., R. R. Co.* v. *Neubeur*, 62 Md. 391, the rule is stated as follows: "But it was not the duty of those in charge of the train to anticipate the conduct of the plaintiff, and because they saw him approach the crossing to conclude that he would attempt to cross in advance of the train.    On the contrary, they were, or would have been, fully justified in supposing he would not venture to cross until after the passage of the train. *Telfer* v. *North R. R. Co.*, 30 N. J. 188."

The principle asserted by these cases and other authorities to which reference has been made goes far to rebut the theory and contention of appellee's learned counsel that the killing of the deceased, under the facts and circumstances in this case, was willful or intentional.

Counsel for the appellee, however, place much stress on that part of the finding of the jury which is to the effect that the fireman on the train, when the deceased was at a point on the highway more than one hundred feet south of the crossing, knew that the latter did not see or know that a train was approaching the crossing, and that the fireman knew that, unless the bell was rung or the whistle sounded, or some warning given, that the deceased would go on to the crossing, and be struck by the engine.    By this finding the legal presumptions in favor of the fireman are said to be of no avail in this case.    In what manner, or by the means of what evidence, the jury could look back to the occasion in controversy, to the time when the engine, on which the fireman was riding, was some distance from the crossing, and the vehicle in which the deceased was driving leisurely along the highway was a hundred feet and over away from the

crossing, and determine and find as a fact that the fireman actually knew what was in the mind of the deceased at the time and place, and that the former actually knew that the latter did not see or hear the approaching train, and what he would do if the signals were not given, is a question which counsel for the appellee have not satisfactorily explained.    It seems to us that there can be no reasonable theory upon which this finding, or, rather, conclusion, of the jury, can be explained, except that it is not the result of any legitimate evidence in the case,—but the offspring of the jury's own surmises or conjectures.    That the fireman on this occasion actually knew what was in the mind of the deceased; a traveler on the highway some distance, at the time, from the public crossing, moving, as he was at a slow gait, and what he would do under the circumstances, does not accord with common, ordinary experience, and cannot be accepted as credible.    *Lake Erie, etc., R. R. Co.,* v. *Stick,* 143 Ind. 449.

Mere surmises, guesses, or conjectures of the jury can lend no support to their verdicts.    In *Babcock* v. *Fitchburg R. R. Co.,* 140 N. Y. 308, it is said:  "Verdicts must stand upon evidence and not upon mere conjecture, however plausible, and if the situation be such that the plaintiff cannot furnish the evidence the misfortune is his."

Appellee also insists, that the part of the verdict which immediately follows that portion which states what the fireman knew, what the deceased knew, and how he would act, lends much strength to their contention that at least the facts show that there was an implied intention on the fireman's part to willfully inflict the fatal injury.    The clause in question is as follows:  "That *the act of said fireman in not* giving or causing to be given any signal by bell or whistle, or

otherwise to said decedent as he approached said crossing *caused the death of said decedent* as aforesaid, *and was done by said servant with a reckless disregard for the safety of said decedent, and a willingness to inflict an injury upon him.*" (Our italics.) If this statement can in any manner be said to be a legitimate finding of facts, it contains two elements, one showing an omission by the fireman to give signals; the other (in italics) as mere evidentiary matters, or conclusions of the jury. Conclusions or evidentiary items have no appropriate places in a special verdict. By the first part of this statement the jury seemingly expose what they considered the true cause of the death of the deceased, namely, the failure or neglect of the fireman to give signals, and then proceed to conclude or state that this act of neglect "was done by said servant with a reckless disregard for the safety of said decedent," etc. Accepting the first part of this statement as a finding of fact, and it would seem to indicate that the theory upon which the jury proceeded is incompatible with the one on which the action is based under the complaint. The jury, by this finding, expressly attribute the death of the deceased to the negligent act of the fireman in omitting to give any signals, and, while this act of omission on the part of the employes in control of the engine may be said to be negligence *per se*, still it was but an act of nonfeasance, and not one of an aggressive character, and cannot establish the willful or intentional killing as alleged in the complaint. For, as heretofore asserted, when willfulness is the element in the act or conduct of the party charged, the case ceases to be one of negligence. There can be no middle ground between willfulness and negligence, for, as we have seen, the authorities affirm that each of these elements is the opposite of the other. Consequently,

when the facts in a given case show that the injury of which the plaintiff complains is the result of the negligent act or conduct of the defendant, then the fact that such negligence may be said to be of such a degree as to be considered "gross negligence" can not support a charge that the injury was willfully or intentionally inflicted by the party accused. This rule seems to be firmly settled in this jurisdiction. *Terre Haute, etc., R. R. Co.* v. *Graham, supra; Pennsylvania Co.* v. *Smith,* 98 Ind, 42; *Ivens* v. *Cincinnati, etc., R. W. Co.,* 103 Ind. 27; *Louisville, etc., R. W. Co.* v. *Schmidt,* 106 Ind. 73; *Louisville, etc., R. W. Co.* v. *Bryan, supra; Brannen* v. *Kokomo, etc., Gravel Road Co.,* 115 Ind. 115.

We have given the argument and reasons of appellee's learned and able counsel, and the authorities which they have cited to sustain the judgment under the special verdict, full consideration, but, in our opinion, there can be no escape from the conclusion that the facts embraced in the verdict cannot sustain a recovery by the appellee under the issues tendered by his complaint. By dismissing the alleged cause of action based on the grounds of a negligent killing of his decedent, he would seem to have conceded that he could not recover on these grounds; possibly for the reason that absence of contributory negligence on the part of the deceased could not be shown.

It follows from the conclusion reached that the court erred in awarding a judgment on the special verdict in favor of the appellee.

The judgment is therefore reversed, and the cause remanded to the lower court, with instructions to overrule appellee's motion, and render judgment on the special verdict in favor of appellant.